**Judith C. ZESIGER, Plaintiff,**

v.

**Albert L. ZESIGER, Defendant.**

**No. 96 Civ. 7819(RLC).**

United States District Court,
S.D. New York.

May 27, 1998.

---

Bragar & Wexler, P.C. (Raymond A. Bragar, Paul D. Wexler, Gregory A. Blue, of counsel), New York City, for Plaintiff.

Proskauer Rose Goetz & Mendelsohn, LLP (Steven M. Kayman, Isaac Montal, of counsel), New York City, for Defendant.

## OPINION

ROBERT L. CARTER, District Judge.

This action arises from an alleged breach of a divorce settlement. Pursuant to Rule 56, F.R.Civ.P., defendant now moves for summary judgment and plaintiff cross-moves for partial summary judgment.

### I. Introduction

Plaintiff Judith C. Zesiger and defendant Albert L. Zesiger were divorced pursuant to a judgment entered by the New York State Supreme Court on or about September 1, 1989. The judgment Incorporated by reference but did not merge the terms of a settlement agreement, dated August 25, 1989 (the "Settlement Agreement"), which, *inter alia*, set forth the financial terms of the parties' marital dissolution.

One particularly contested issue in the matrimonial action was the value ascribed to defendant's 27,615 shares of stock in BEA Associates, Inc. ("BEA"), a money management firm in which defendant was an officer, director, and employee. Ultimately, the Set-

tlement Agreement provided that for a period of eight years following the settlement (the "Payment Period"), defendant would notify plaintiff as to the number of BEA shares, if any, sold or otherwise conveyed by him at a price per share *in excess* of a "formula price," stipulated to be $404.20 for purposes of these motions.[1] (Pl.'s Mem. of Law at 1). In such event, the Settlement Agreement further provided that defendant would pay plaintiff a supplemental distributive award ("SDA") as scheduled in the Agreement.

In 1990, BEA entered into a series of transactions with Credit Suisse Capital Corporation ("Credit Suisse") involving, *inter alia*, the creation of a joint venture partnership, the sale of assets by BEA to Credit Suisse, and long term employment and noncompete commitments by defendant and other BEA employees. At this time, defendant sold 14,655 of his BEA shares. Defendant sold the balance of his shares over the next five years. On October 7, 1996, plaintiff filed a complaint in federal court[2] contending that defendant sold or otherwise conveyed all 27,615 shares of BEA in 1990 for more than the formula price, thereby obliging defendant to pay plaintiff an SDA of $2,761,500 plus interest from the date that the payment should have been made. Plaintiff also requested attorneys fees based upon a default provision in the Settlement Agreement.

Defendant claims that he did not sell or otherwise convey any of his shares for more than the formula price and now seeks summary judgment. Plaintiff, in turn, has crossmoved for partial summary judgment, claiming that it is uncontroverted that defendant's conveyance of 14,655 shares of his BEA stock in 1990 exceeded the formula price and triggered her right to an SDA in the amount of $1,465,500 plus interest and attorneys fees.

## II. History

When BEA entered into a joint partnership with Credit Suisse, defendant claims that Credit Suisse gave him a choice of either selling his shares and retiring or receiving attractive bonuses predicated upon five more years of employment. (Def.'s Mem. of Law at 11). Specifically, defendant contends that Credit Suisse offered annual bonuses and "Additional Compensation" based on performance. *Id.* at 12. Defendant also contends that Credit Suisse agreed to pay a portion of the purchase price for BEA's assets only in the form of "Specified Anniversary Payments" and "Earn Out Payments" which were contingent upon defendant's continued employment. *Id.* According to defendant, not only would he have forfeited his right to these payments had he left BEA before the five years expired, but he also alleges that he would have been required to guarantee a repayment obligation of up to $1.1 million in the event any of the other key employees left BEA prior to the completion of the five year term. *Id.* Finally, had he not agreed to Credit Suisse's conditions, defendant contends that he would have foregone a $2.5 million signing bonus. *Id.* at 13.

Defendant opted to remain at BEA and, accordingly, received $10,198,275 from a "Special Bonus Pool" and $2,555,772 from a "Special Dividend Pool" in 1990, the year the transaction was consummated. *Id.* at 6. That same year, defendant received an additional $760,894 expressly for 14,655 BEA shares that he sold back to the company. *Id.* From 1991 through 1995, defendant sold the rest of his BEA shares for a total of $1,894,456; he also was paid Specified Anniversary and Earn Out Payments in annual installments totalling $6,966,725 during this period. *Id.* at 15. According to plaintiff, defendant also received approximately $30,000,000 from a "Purchase of Assets" fund distributed by Credit Suisse to key BEA shareholders. (¶ 7, Declaration of Gregory Cowhey, dated July 22, 1997).

Neither side disputes that, under the Settlement Agreement, defendant would have

---

1. The formula price is a price fixed in the BEA Shareholder's Agreement for the internal allocation of partnership interests. It is one times gross revenues plus book value. Shareholder's Agreement, ¶ 1.2.

2. The court has jurisdiction over this case pursuant to 28 U.S.C. § 1332 because the action is between plaintiff, a citizen of the State of New York, and defendant, a citizen of the State of Connecticut, and the sum in controversy exceeds $50,000.

been obligated to pay plaintiff an SDA if defendant sold his BEA shares for more than their formula price during the Payment Period.[3] Rather, the conflict stems from the parties ascribing different values to defendant's compensation for his BEA shares. This difference arises because plaintiff views defendant's total compensation from the Credit Suisse transaction as a lump sum price for defendant's stock, while defendant differentiates between payments for his BEA shares and payments for his ownership interest in BEA's assets. Defendant argues that the Settlement Agreement does not "trigger [plaintiff's] right in a SDA [sic] if Defendant sold or received consideration for his 'interest' in BEA other than for the sale of his Shares." *Id.* at 17. In other words, defendant contends that a right with respect to the sale of shares does not give rise to a right with respect to the sale of assets. *Id.* at 21. Thus, defendant argues that he was only paid $51.92, $53.75, $74.10, $94.89, and $148.87 per share when he sold them in 1990, 1991, 1992, 1993, and 1995, respectively,[4] and that plaintiff is attempting to unjustly "re-characterize" his bonuses and other additional compensation as part of the stock purchase price. *Id.* at 16.

In justifying the uncoupling of his BEA stock from the rest of his compensation package, defendant indicates that other major BEA shareholders who did not sell their shares also received compensation in the form of Special Bonuses, Special Dividends, and Earn Out Payments. (See Declaration of Keith W. Gardner, dated September 4, 1997 ("Gardner Decl.")).

Defendant also asserts that the tax treatment of his income from the Credit Suisse transaction is dispositive of the true price garnered for his BEA shares. (Def.'s Mem. of Law at 22, 23). Since capital gains tax treatment is generally afforded only to the realization of income from the sale of long term capital assets such as stock shares, defendant argues that his Special Bonus and Special Dividend payments, which were reported on defendant's tax returns as ordinary income instead of capital gains, could not be considered payment for his stock. *Id.* Thus, defendant claims that the only distributions from the Credit Suisse transaction that could be treated as capital gains—the Specified Anniversary and Earn Out Payments and consideration for the BEA shares—either in 1990 alone or in total would not add up to a price per share that exceeds the formula price of $404.20.[5] (*Id.* at 23, 24).

For all the reasons stated above, defendant argues that plaintiff fails to present any genuine issue of material fact indicating that his BEA stock sale exceeded the formula price. Accordingly, he urges the court to grant his motion for summary judgment.

In her cross-motion for partial summary judgment, plaintiff alleges that defendant received at least $29,466,000 in the Credit Suisse transaction based upon his 29.44% stock ownership of BEA. (Pl.'s Mem. of Law at 2). Plaintiff maintains that $13,514,941 of that sum, issued in 1990, also was based exclusively upon defendant's percentage of stock owned. *Id.* Either one of these figures exceeds the formula price for defendant's stock.

Plaintiff also argues that defendant's compensation must have exceeded the formula price since he turned down a cash offer for his BEA shares at the formula price in order to proceed with the Credit Suisse transaction. *Id.* at 2. In addition, plaintiff contends that the deposition testimony in the original matrimonial litigation between the parties demonstrates, *inter alia,* that the value of

---

**3.** Paragraph 7(b) of the Settlement Agreement provides that:

> [I]n the event that the Husband, in his sole discretion, shall sell or otherwise convey BEA Shares during the Payment Period at a price in excess of the then Formula price ... the Wife [shall] be entitled to a SDA pursuant [sic] to this Paragraph 7.

**4.** In 1994, defendant purchased 241 BEA shares for $120.24 per share.

**5.** Defendant's recognized capital gains in 1990 amounted to $1,594,094, which, with the sale of 14,655 shares, results in a price per share of $108.77. If all of defendant's capital gain items received in connection with the Credit Suisse transactions ($8,861,181) are factored in with all of defendant's shares sold (27,615), his price per share would be $320.88. Both amounts fall below the formula price of $404.20.

defendant's BEA shares was significantly more than the formula price and that defendant was adverse to selling his shares for any price that was not a multiple of formula. (Pl.'s Mem. of Law at 3). Based upon these arguments, plaintiff not only opposes defendant's motion for summary judgment, but also seeks partial summary judgment for herself.

### III. Analysis

Rule 56(c), F.R.Civ.P., provides that summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), F.R.Civ.P. The moving party carries the initial burden of showing the absence of evidence to support the non-moving party's claim, *Pressman v. Estate of Steinvorth,* 860 F.Supp. 171, 176 (S.D.N.Y.1994) (Carter, J.). The burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), F.R.Civ.P. While the court is to draw all reasonable inferences in support of the non-moving party, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the court should not be reluctant to grant summary judgment in cases where an element essential to prove the non-moving party's case is factually unsupported in the record. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

#### A. Defendant's Summary Judgment Motion

Pursuant to Rule 56, F.R.Civ.P., in order to overcome defendant's showing of the absence of evidence to support her claim, plaintiff must introduce facts indicating that the price defendant received for his BEA shares could have exceeded the formula price and is a genuine issue to be decided at trial.

Plaintiff's primary contention is that defendant cannot disaggregate a "financial flood from the Credit Suisse transaction" in order to attempt "to pull out one stream of income and call it the sale price for the stock." (Pl.'s Mem. of Law at 8). The Settlement Agreement defines "price" as:

> consideration including, without limitation, cash or cash equivalents, paid to the Husband in exchange for the transfer of BEA Shares, in one or more related transactions; ...

(Settlement Agreement, ¶ 7(f)(ii).) Plaintiff argues that the entire Credit Suisse transaction is "either one transaction or, at the very least, a group of 'related transactions.'" (Pl.'s Mem. of Law at 10). She also emphasizes that the price is the amount received for the "transfer of shares" instead of just the amount for the "shares," thereby implying that all proceeds received by defendant in connection with this sale should be considered by the court in evaluating whether the formula price was exceeded.

Plaintiff bolsters her argument with the fact that Credit Suisse paid defendant 29.44% of the distributions from Special Bonus and Special Dividend Pools. This percentage matches the percentage of stock that defendant possessed at the outset of the Credit Suisse transaction, a fact which, according to plaintiff, indicates that the bonuses were actually payment for defendant's shares.

Defendant avers that Special Bonuses and Special Dividends were distributed to other BEA shareholders in proportion to their shareholding prior to the Credit Suisse transaction "without regard to whether a particular shareholder bought or sold shares, or did neither, at the time of the [Credit Suisse transaction]." (Gardner Decl., ¶ 8). In particular, defendant claims that Mark Arnold increased his stock ownership in BEA after the Credit Suisse transaction to 17.8% even though he continued to receive Special Bonuses and Special Dividends in proportion to his pre-transaction shareholding of 7.8%. (Gardner Decl., ¶ 9). Furthermore, defendant argues that his own annual Earn Out Payments and Specified Anniversary Payments over a five-year period comprised 29.44% of the total funds distributed to officers during that period, even though defen-

dant annually sold portions of his stock which lowered his stock ownership below 29.44%.

After reviewing the parties' submissions, the court finds that a more detailed analysis of BEA shareholders' sales and purchases is necessary before the court can broadly conclude that shareholders were given bonuses regardless of their stock activity. As it stands, defendant cites isolated stock purchases that had no concurrent remittance as proof that no shareholder received additional payments for selling stock. Moreover, even if defendant's Earn Out and Specified Anniversary Payments remained constant over a five year period as his stock ownership percentage declined, such a fact does not preclude the possibility that the annual payments were part of a previously agreed upon price that was to be distributed over a specified length of time. Therefore, defendant's arguments concerning the compensation received by other BEA shareholders as well as his declining shareholdings in relation to his Earn Out and Specified Anniversary Payments are unavailing for purposes of summary judgment.

Plaintiff also argues that the tax treatment of defendant's income related to the Credit Suisse transaction is irrelevant to the Settlement Agreement's interpretation. Plaintiff avers that, had the parties intended to use defendant's tax returns as a basis for establishing liability, "they could have easily so stated" within the Agreement. *Huntington v. Huntington,* 80 A.D.2d 634, 436 N.Y.S.2d 85 (2d Dep't.1981). In *Huntington,* an action to enforce a separation agreement under which an ex-husband was to pay his ex-wife alimony representing one fourth of his gross income, the court rejected the husband's contention that the business deductions he was allowed to take on his income tax returns were proper deductions under the terms of the agreement. 436 N.Y.S.2d at 86.

In the instant case, defendant does not seek to use the Internal Revenue Code to define price in the manner that the husband in *Huntington* sought to use the Code to define income. Instead, defendant contends that the tax treatment of *all* his income from the Credit Suisse transaction, outside of the special bonuses, indicates payments insuffi-

cient to raise the price per share of his BEA stock above the formula price. In light of defendant's broader use of the Code, *Huntington*'s reasoning applies to the extent that defendant's tax treatment arguments are relevant to, but not determinative of, the price per share of defendant's BEA stock. Therefore, a genuine issue of fact remains as to whether defendant's Special Bonuses, Special Dividends, and Special Anniversary and Earn Out Payments should be considered part of the stock purchase price. Defendant's motion for summary judgment is denied.

### B. Plaintiff's Partial Summary Judgment Motion

■ Plaintiff argues that it is uncontroverted that defendant's 1990 sale of 14,655 BEA shares exceeded the formula price for three reasons. First, she argues that he received at least $29,466,000.00 from the Credit Suisse transaction based upon his BEA stock ownership. (Pl.'s Mem. of Law at 2). Second, she argues that defendant acknowledged in his moving papers that he turned down a cash offer for his BEA shares at the outset of dealing with Credit Suisse, thereby suggesting that the Credit Suisse transaction offered him a better price per share for his stock. *Id.* Third, plaintiff alleges that deposition testimony from the original matrimonial litigation between the parties reveals that defendant valued his BEA stock more highly than the formula price provided and was adverse to selling his stock for anything less than a multiple of the formula price. *Id.* at 3.

Plaintiff's arguments that the sum total of defendant's income from the Credit Suisse transaction constitutes the price received for his BEA stock have already been articulated *supra,* Part III.A, in response to defendant's disavowments of any relationship between additional payments and a shareholder's stock activity. Although defendant's assertions concerning other shareholder's stock purchases and his own Special Anniversary and Earn Out Payments were insufficient to warrant summary judgement in his favor, they do "set forth specific facts showing that

there is a genuine issue for trial." Rule 56(e), F.R.Civ.P.

Nevertheless, plaintiff urges the court to look to the "substance of the transaction" and to apply the holding in *Brown v. Keating,* 182 A.D.2d 552, 582 N.Y.S.2d 422 (1st Dep't 1992), in her favor. In *Brown,* a wife moved to enforce a stipulation of settlement which provided that she would not owe her husband money if the sale of the marital residence did not realize a "net profit" above the "upset price," defined as the balance due on the mortgage plus the brokerage fee. Although the sale did realize an amount in excess of the "upset price," additional closing costs exceeded the difference. Despite the stipulation's wording, the court held that plaintiff had not realized a net profit since such an interpretation would have left the term "net" meaningless. *Id.*

In the instant case, interpreting the Settlement Agreement's price provision not to include defendant's additional bonuses in the total consideration for defendant's stock would not render the term "price," or any other term, meaningless. The intent of the contract is not jeopardized by a narrow interpretation of its plain language and does not require a liberal construction in order to give meaning to any of its provisions. *See Belgrave Owners, Inc. v. OR Holding Corp.,* 233 A.D.2d 352, 650 N.Y.S.2d 249, 250 (2d Dep't 1996) (holding "clear, complete writings" mandate interpretation from the "four corners" of the contract). Therefore, *Brown* is distinguishable and the court can review defendant's rebuttal of plaintiff's charges unencumbered by its holding.

■ Plaintiff also argues that defendant violated his obligation under the Settlement Agreement to "exercise good faith in carrying out the intent" of the provision regarding the SDA. (Pl's Mem. of Law at 13). According to plaintiff, defendant had a limited number of well-defined situations in which to transfer his BEA shares for other than fair consideration without violating the good faith requirement. Plaintiff argues that the Credit Suisse transaction does not fall within any of these "safe harbor" provisions and that defendant failed to exercise good faith by defining the price of his BEA shares in such a way as to deprive plaintiff of an SDA.

In this particular case, the defendant avers that he transferred his shares at a price less than the formula price and, accordingly, does not owe his ex-wife an SDA. This argument sails easily into the Settlement Agreement's "safe harbor" provision which explicitly states that the defendant:

> may choose to give or transfer BEA shares at a price equal to or less than the then Formula Price, to a spouse other than the Wife, child, or to such other third party as he chooses in a non-arms'-length transaction. [Defendant] shall have the absolute right to make such transfers and under such circumstances the [plaintiff] shall receive no SDA on account of such transfer.

Settlement Agreement, Part I, § 7(d). In accusing defendant of making his claims in bad faith, plaintiff has only offered allegations. Without more and in the face of a proffered justification for defendant's actions, plaintiff's argument fails on this point for summary judgment purposes.

■ Plaintiff's claim that defendant rejected a cash offer for his stock at formula price is also unpersuasive. This assertion rests upon paragraph 27 of defendant's moving Declaration which states:

> In fact, I opposed the Credit Suisse Transaction but did not have the ability to veto or otherwise stop the transaction. I was effectively forced to 'take it or leave it' under the threat of being fired and having to sell back all of my BEA shares at the formula price.

Defendant denies ever having been made a cash offer for his BEA shares. (Reply Declaration of Albert L. Zesiger, dated September 5, 1997.) In any event, this fact alone would not be determinative in this case. While at first glance, selling stock potentially worth more than $400.00 per share for $51.92 per share evinces a suspicious lack of business acumen, defendant's gain through bonuses, Specified Anniversary Payments, and Earn Out Payments exceeded the compensation defendant would have earned had he only sold his shares at formula price. If, at trial, it is established that defendant's additional compensation should not be included in

the stock price, then defendant's financial arrangement could be deemed shrewd.

Plaintiff's contention that deposition testimony from the original matrimonial action proves that defendant sold his stock for more than the formula price also is unavailing for summary judgment purposes. Plaintiff culls testimony from the depositions of Emilio Bassini, a former BEA Vice President and Chief Financial and Administrative Officer, and of defendant that suggests that BEA shareholders, including defendant, considered BEA's stock price to be greater than the formula price and were adverse to selling it at that price. (See Declaration of David Aronson, dated July 22, 1997). However, this testimony is ambiguous at best and requires the court to make inferences in order to reach the conclusions that the plaintiff seeks. For example, as evidence that defendant would not sell his BEA shares for 1/7th of their formula price, plaintiff conflates Bassini's testimony that "everybody knows, if the company were to be sold that the price would be considerably higher than the inside formula price," and defendant's refusal to support taking BEA public at a price quadruple the formula price. Such inferences, although they may be plausible, are not sufficient to warrant summary judgment.

Finally, plaintiff's claim that defendant's bonuses were not contingent upon any future event (i.e. continued employment with BEA) (Pl.'s Mem. of Law at 6), is unhelpful in persuading the court to grant partial summary judgment. Contingency of employment is not dispositive in establishing the stock price in this case, so much as contingency of the transfer of stock. Plaintiff has presented no direct evidence that these bonuses were predicated upon or directly related to defendant's selling his BEA shares. Although defendant did agree to reduce his BEA share ownership to 13.82%,[6] plaintiff has not shown that any further reduction was required by Credit Suisse or even that this initial reduction was anything other than BEA's standard annual stock realignment procedure. The additional payments received by defendant may correlate more to his interest in BEA's assets or to his worth

to the company. Accordingly, plaintiff's motion for partial summary judgment is denied.

## IV. Conclusion

Neither defendant nor plaintiff has demonstrated an absence of genuine issues of material fact to support their respective motions for summary judgment. Accordingly, both motions are denied.

**IT IS SO ORDERED.**

---

**6.** See Master Agreement, Section 8.11, Schedule 5.2(b)(ii).